May it please the Court. Good morning, Judge Kovacrock. I represent Reliance, who is the appellant at the Cross Ability in this case. This lawsuit involves two identical ERISA disability claims by the same claimant. In the one, the District Court upheld the denial of short-term disability benefits based on the claims for existing conditions of exclusion. In the other claim, the Court awarded a long-term disability benefit without considering the merits of the claim based on what it believed was a procedural violation. That decision is contrary to the law of this circuit. And by the way, I'd like to reserve Mr. Smith some time for a moment. First, we excuse that it was a procedural violation. And I'll briefly explain that. The plaintiff's whole complaint only alleged that he submitted a short-term disability claim. There was no mention of long-term in the complaint as far as being submitted. Also, this is an application that is short-term and long-term integrated, even the claim forms as integrated. If you don't get short-term, you're not going to be eligible for long-term. Third, when Reliance the editor denied the short-term disability claim, it was appealed. And in that appeal for Mr. Smith, there was no mention of, well, what happened to my long-term disability? I submitted both, and you never decided it. And this Court has always said it has to be a meaningful dialogue between a claimant and an administrator. If we need information from the claimant, we have to ask for it. And if he thought that the long-term disability claim also needed a decision, he should have asked for it. And we also have the fact that after this lawsuit was filed, even he wasn't sure that there was a long-term disability claim submitted because he asked Reliance to do so, and it did. It made a decision, again, after the lawsuit was submitted. But the district court here refused to even acknowledge that that occurred. So we don't believe there was a procedural violation. We didn't think there was. What the Court did here is it allowed the risk of statute. It's been around for 40 years, more than 40 years. And except for this decision in this case, I haven't been able to find a single case in which a court automatically awarded benefits based on a procedural violation. So let's say that we agree with you on that point. What could we do on that point? I understand. Well, so the question is, what do you do? Exactly. This Court has taken different views in the Hoffman v. Screen Actors Guild case that we cite, so it's unpublished. The Court said that it should be remanded so the issue could be fully developed. But here that's already happened. So we think that the Court should then look to see if anything, should the district court then look to see whether there's an abuse of discretion to deny the long-term disability? Then you have the other line of cases, which are the Abadie case is the prime example. It's an ongoing decision from this Court, where the Court said if there's a wholesale and flagrant violation, then the Court reviews the denial to no vote. So that's the other option here, is for the district court to go through that. That's what it mainly is. Your view is that we should send this back to the district court and the district court should I don't think it's even necessary in this case. That's what I'm trying to say. I don't think it's necessary because, again, in Hoffman, the Court said that this Court has unlimited power to see how a case should be handled. It can affirm or reverse on any basis, and the evidence here is just so overwhelming. We have a decision based on evidence that the Court said that he's not And it's important to note that when he did argue that there was no decision on the long-term, he never said, oh, I would have submitted additional information. So he's not claiming that he was harmed in any way. And, in fact, even during that letter argument is that if it's a pre-existing condition sufficient to deny benefits for short-term disability, then it has to be a pre-existing condition sufficient to deny well-interpreted pain. Exactly. It has to be because there's no difference in the language in the pre-existing condition exclusions between one policy and the other, and there's no difference in the facts. The facts really are undisputed. So the work is through the factual analysis. Okay. Because the term sickness or real sickness in the pre-existing condition exclusion, to find that for us it's the tumor, is that what, is that ultimately what caused his disability, right? So if we define the, I can't remember if it's the term sickness or real, it's sickness. Sickness. But, and the fine sickness is illness or disease causing disability. Right. That's what I'm saying. So the tumor is what ultimately caused the disability. Correct. Right. So we have to then conclude that the tumor existed at some point during that time. Correct. So he sought services, consulted with people, care, and diagnostic tests. For the tumor, even though it hadn't been diagnosed. Correct. Okay. That's what I'm saying. Yes. So we need to be able to determine from this record that the tumor existed, whether someone knew it or not, during that lifetime period. Well, not just that it existed, but that he received care, services. Right. So. But that makes it harder. For symptoms that were related to a developing tumor. Correct. Now, that's what I'm trying to figure out. Is that the symptoms? Right. That's what the courts have said. In the Loza case, which is kind of a certain unpublished decision, in the lymphocamp case, which is Arizona State Court, what they talked about was did the person have care, services, et cetera, for symptoms that were later diagnosed as the cancer. And you're relying on the opinions of the, well, Toleran biologists and consultant medical team guys. That's a better choice. Or maybe it's Cox, who looked at the file and said, we can say to a reasonable degree of medical certainty that when he went to see the health care providers starting in December, that he was seeing them for symptoms that were the symptoms in this predicted form before he was treated. Correct. In the administrative record for the short-term disability claim, that's what Dr. Lifkin said. And it really is undisputed when you look at the evidence supporting it. For example, he said, I've had sinus infections in the past. I thought that's what this was. But when I've had antibiotics, usually to me underwent two courses of antibiotics and it didn't affect his symptoms. He lost the sense of smell. That's not a routine thing that one gets from a sinus infection. I've had chronic sinus infections. That's not a symptom of it. It's left eye throat. He lost weight. He had nosebleeds. These are all symptoms of this cancer, this tumor which originates in the sinus. We also, we know it was there because there was this diagnostic test performed during the treatment-free period before his effective date of treatment. And what happened there was the doctor saw this enlarged area, this enlarged red area. Now, he thought it was just swelling due to a sinus infection. It wasn't. But that seems to be the case. This is January 7th or 8th. Yes. And so that doctor wrote a letter, though, where he said that the tumor was not present. And if you're reviewing the, what was the guy's name? Dr. Lifkin. Dr. Lifkin seemed to have found that this person said that there was not a tumor present at that date. But we seem to assume that it must have, you know, obviously rose at some point after. No, no, no. Dr. Lifkin says the opposite. Dr. Lifkin says that it was there. He says this large tumor would not have occurred this quickly. Yeah, yeah. But he doesn't say within his messages when it arose. He says that it's highly likely that the tumor was present during the 12-1-2013 to 3-1-2014 period. And all he can say is that it was likely present for an extended period, something before the March 5th. So he has a template. I don't think he challenges the lack of existence of a tumor as of January 7th or 9th. He just says it arose some way after that, and for an extended period of time. And the key dates here are the coverage effective dates March 1. So the 90 days when he had to be treatment-free was dates back into the summer. So if he's saying it existed for a period of time before he was diagnosed on March, that takes us well into the December, the January dates. And he goes, this was on March 5th. That's when March 5th. So then he went back to the 90 days. And that takes us through December when he's first seeing a doctor, his primary care doctor, who gives him antibiotics to fight him. It doesn't work. And then he goes to Dr. Rubines. And as the doctor says, I don't think the tumor was there. You know, frankly, he made a big mistake. This is a rare type of cancer, a rare form of cancer. Well, look, you said that Dr. Libby does not say that another doctor was wrong. He never says that. I mean, he does. He says this large tumor could not simply appear for the first time when it was diagnosed on March 5th. Exactly. That doesn't mean it existed on January 9th. He never says that. He notes in fact that the other doctor made the correct disclosure. He never says that. I think he does dispute it. Well, when he's saying that it had to, that it did not, and I'll go back to it during my time sitting down. But my reading of it is, you know, he's saying, look, these symptoms were here during this. The symptoms of the tumor. We're talking about the tumor. That's all I'm talking about is the tumor. But the tumors, those are all symptoms of the tumor. The nosebleed is a symptom of the tumor. The lost weight, the tumor was not present on January 7th or 9th. We have doctors saying that, and we have no doctor with you. Unless you're going to point me to something else. So whatever symptoms you're talking about were some kind of precursor. The tumor itself, from the examination that occurred on that day, it was homeless. There is no precursor, Your Honor. The tumor, the cancer is the tumor. The tumor originates in the science. And it works its way into the uterus and skull. And so there's nothing separate. All those symptoms, everything that occurred before January 7th or 9th, you can just throw that out because you just conceded that that's not. That was for something else. You have a doctor who says on January 7th or 9th, there was no tumor present. Right? And he's wrong. He's flat out. You're a doctor, and you were there on January 9th. You know that if you'd done the examination properly, it would have been disclosed. No, because Dr. Lipkin is an auto-laryngologist. He never says that it was there on that day. That's all I'm saying. Like, we totally disagree with that. Wait a minute. Can I look at the record? Can I get everybody's attention? Look at ER 548. The paragraph that starts at the bottom of the page, it says Lipkin's report page 2. Although that statement was created for symptoms highly likely relating to his malignant nasal tumor, prior to the date of the loss, he was not aware of the presence of the tumor during that period and was treated for symptoms thought to be due to sinusitis. In hindsight, it is highly likely that the tumor was present during the December 1, 2013 to March 1, 2014 period, and was the cause of the symptoms. This was a large tumor and obviously did not simply appear at the time of the March 5, 2014 auto-laryngology visit, during which it was discovered. I read that. To me, I can't tell you exactly when this thing started growing, but I can tell you that if it was this big on March 5, he had it in that night. And I know before it was covered by the tumor. Is that what he's saying? That's what I read. To your honor. And I think also we have support for that. During the long-term disability claim, there was a further medical review, and that also substantiates the fact that this tumor was present and these symptoms were present. So going back to then the original question here is what do we do? I think that what needs to get done is judgment entered for Elias, because there's no difference between the claims facts or the policy language, and establishes that the preexisting condition of exclusion applies here. And I'd like to reserve the remainder of the time for you. Thank you. Good morning, Your Honor. This is Joe Phelps on behalf of Craig Smith. Thank you for this call. Let me begin by addressing what I think is the most important issue, which is there are two separate claims. And if Brazil lays out an exclusion, the insurance provider needs to follow, if it wants to be the claim administrator, as to what it needs to do. There's no dispute. Don't you agree that it's the same exclusion in both worlds? The exclusion is slightly different. The language is largely the same. Whether the language is identical or not, what's important here is that there are two separate claims that under I guess what I'm trying to get to is what additional evidence would you have provided in regard to the long-term disability claim that you didn't provide in regard to the short-term disability claim? Let's do that. Which is, this is the importance of why you need separate determinations for the claims. The short-term disability is somewhere in the ballpark of $15,000. I get the economics, but what I'm wrestling with here is why it doesn't make logical sense to conclude that if a pre-existing condition existed as a result of this tumor, it defeats the claims of short-term disability benefits, that it would also defeat the claims of long-term disability benefits. Let me take your first question, which is, what more could have been done if Mr. Smith knew that they were denying the long-term disability claim? There's a bunch of things, okay? One is, he got a letter from each one of his doctors that said, we didn't treat you for these ischial neuroblastoma, which is called brain cancer for a reason. It's hard to understand. He then got a specific letter from Dr. Morganis that said, no neoplasm, no cancer present. He submits the short-term claim. He submits a long-term claim. He fills out a proof of loss. There's no dispute that he's fully disabled. He had a large part of his brain removed, and I think the disabling condition is not necessarily the tumor. The disabling condition becomes when they take out a big part of his brain. The surgery that removes his brain, which happens a couple months later, is what actually disables him. But let's come back to, he stopped working on March 5. March 5, because he needed to. Isn't that the onset of disability? I believe it would be, yes. So even under a leap for long-term disability benefits, wouldn't that still be the trigger for purposes of applying the creative state conditional language? I'm not discreet. I would be the trigger and it would be March. He's actually not diagnosed. He goes to Dr. Sutterberg. Dr. Sutterberg on March 5 says, something looks wrong here. I see something I don't like. I need you to go get a brain scan. He goes for the brain scan roughly two weeks later, and at that point, they get a little piece of his brain to figure out what's going on, and then they determine he has schizophrenia. So I can't give you the exact date, and I don't think it's critically important, but the actual diagnosis doesn't happen until roughly a month later. I thought the diagnosis was made on March 5. No, on March 5. Dr. Sutterberg says, there's something wrong here. I see a mass. It needs to be investigated further. He does not diagnose his neoplasma at that time, because he can't, because the only way to diagnose his neoplasma is through a brain scan and then through a biopsy of the brain, which is what ultimately was done. It certainly was diagnosed as of at least March 21. That's the date where he goes in and has the brain scan, which is March 21. And so, you know, I don't think that's part of it. The critical point here is, they didn't follow the procedures, the results were going to the long term, and you're asking the question, well, why should you get a different result under one than it gets into the other? And this happens every day of the week, which is, let's flip the coin. Let's pretend like Mr. Smith applied for short term, but didn't apply for long term. This case plays out. Let's see Judge Collins down in Tucson and says, Mr. Hearst, you're right. Mr. Smith is entitled to short term. We then say to Judge Collins, wait a second. We forgot to apply for long term, and we want it now. They would be screaming, as they did in their briefs, that no, you're not entitled to long term, because you did apply to it. Now, the logic is... Well, that's not what they're saying. They're saying he's not entitled to long term for the same reason he's not entitled to short term. Right, and so if I had a, if he didn't respond, and if the opposite were true... Let me ask you a different question. Sure. It seemed to me that what Judge Collins did, and I have great respect for him, if he's a fine history judge, but I think what he did was, he said, I see a procedural violation here, a failure to adjudicate the long term disability claim in a timely fashion, and my remedy for that procedural breach is to remand and order the payment of long term disability benefits. And I'm not sure he has the authority to do that under a full screen of the law. And so let's take what Mr. Smith did in the briefs and control the situation, which is followed, and follow what the court says. Every court is saying the same thing, and they have not asked for Harlick to be reversed. What Harlick says is, if you don't raise something at the appeal level, you can't raise it later. And that's exactly it. The record that Judge Collins had in front of him, when we got to the court, I was there arguing. The other side looked at him, and their argument was, he has not applied, okay? And Judge Collins took out the long term and the short term. Judge Collins concluded that he had, and that Reliance hadn't adjudicated within, what is it, 90 days or whatever? And so why shouldn't the resolution here be, if we agree that he did file a long term disability claim, but then for whatever reason, Reliance didn't finally adjudicate it, that we send this back to Judge Collins and ask him to determine whether or not it was an abuse of discretion for Reliance to deny coverage on the long term disability benefit claim based on. So, let me give you three reasons. One is, it's valid to make a determination itself. It's an abuse of discretion. It's there being an appeal denied in 71, and it's also in line with other charges. The second is that it's okay for the district court to direct a court of benefits based on a failure to timely adjudicate the long term disability claim. It's not merely just a timely failure. That's just what you guys case for. I think it's back to Harlan. It's not merely just a timely failure to adjudicate. Judge Collins then has the right to then adjudicate that claim based on the administrative record for the long term disability claim that was in front of him. But the only thing in the long term disability claim that was in front of him, and there are two separate claims with the original procedure, was the proof of loss by Mr. Smith and the reports of his documents. There was nothing in there that in any way said any basis. Insurance companies, every day of the week, don't raise exclusions. Let me make sure I understand your argument here. So you're saying that if it were to be remanded on the long term disability claim, the record would actually be shorter than it was on the short term disability claim because clients couldn't consider the two EMTs' opinions that they relied on in doing the short term disability claim. Is that your position? That is correct, Your Honor. What's your best authority for that? My authority for that, among other things, is that if you don't raise something in the administrative level, you can't bring it to court. There's dozens and dozens of cases that say insurance companies can't bring in post hoc rationales after the fact. And the reason for that is you get this expedited procedure without a jury trial. Talk about it if it's the same pre-existing condition and the same set of facts that they have previously denied coverage on because of the pre-existing condition. Because there's two different claims with the requirement of two different responses to the claim under the Department of Labor regulations. Okay. And give me the Department of Labor regulations. I'll come to it at the end, but it's 29 CFR. It's in my brief, but we'll get to the exact buckets. Give me the page here where you find it. We'll need that. Okay. It's 29 CFR 0560.503-1. And if you look, that's on page 34. What are you reading? 0560.25-1. It's 0560-503-1. 0560-503-1. Okay. Let me turn to actually the short term, which is the policy language here matters. Okay. From what you said, in the short term, even the pre-existing condition is the treatment must be for the disability, for the illness. Okay. And I hadn't thought about the word for very much until I got to this period. And when we come to the word for, what does it mean? It means with an intent to do something. Let's pretend, for argument's sake, that the four of us become friends, and after this hearing, we decide to go out for coffee. Okay. That's our purpose, and that's our intent. When we get there, by accident, the waitress slips some liquor into our coffee. We didn't go out for liquor. We went out for coffee. And the reason the word for is important is somebody must have some knowledge intent, either on the side of the doctor or on the side of the patient, to get treatment for that condition. You can't have this hindsight look back with the word for. If they wanted to instead, they could have said any care, custody, or diagnosis. And that's important. In this theory, it would require a claimant to have to self-diagnose his ailment at the time that he saw it was really, as opposed to a more common situation where something's wrong, and the claimant goes to see the doctor with the presentation of symptoms and he's relying on the doctor to make a diagnosis. And that's exactly this, which is the purpose of the pre-existing consumption is if you get to Loza, which is the case that Judge Collins relied on, unreported, but let's accept that case came up to the Ninth Circuit once, under a claim that Mr. Loza committed insurance fraud in applying for insurance after knowing that he already had prostate cancer. The Ninth Circuit said there's a factual issue on that. They send it back. The facts on Loza were this, which is Mr. Loza had family history of prior prostate cancer. He had flow problems with his urination. He went to his primary care physician. The primary care physician did a rectal examination and found that he had an extremely enlarged prostate. He then orders a PSA test. The only consequence is to figure out if you've got prostate cancer. The guy comes back with a highly elevated PSA level. He then, after knowing this, fills out an application for disability insurance and life insurance, and that's facts of Loza. All of it was known and known to him and to his doctors. Here's the facts of Mr. Smith, which is he has no idea that he has this condition in any way, shape, or form, neither do his doctors. As you're reading out of the exclusion, the language, whether or not I know this, I'm going to tell you why, which is let's jump forward and let's change the facts real slightly. Let's just say the start period is March 7th instead of March 1st. Mr. Smith goes to Mr. Soderberg, Dr. Soderberg, and at that point, Dr. Soderberg says, There's something wrong here. I don't know what it is. It's that diagnosis, okay? But at that point, Mr. Smith, at that point, Dr. Soderberg, knows there's a potential for cancer. He needs him to go get a brain scan. That's the meaning of whether diagnosed or not, which is the condition on March 5th is still undiagnosed, but he's received treatment for it because the doctor knows that he now needs to have his brain scan, and that's the difference. The words are not being sent out, which is whether undiagnosed or not means you don't have to wait for a formal diagnosis, but nevertheless, the word for is there has to be some intent. Is it the basis of the referral the doctor's concerned that it might be a brain tumor? On March 5th, yes, but that's not the... Have referred him if he hadn't heard about that. On March 5th, after the start period starts, nobody back in January, well, it goes to February, nobody's suggesting brain cancer, and it serves the purpose of we should be able to avoid somebody going and fraudulently trying to get insurance policy, right? The exclusion to say that it has to be based on a medical diagnosis and not either diagnosed by a health care professional or by a patient with insufficient possession of facts is a self-diagnosis that I've got to prosecute for. No, if Dr. Soderbergh didn't diagnose the disease, yet that would still be treatment. We're not trying to write the language out. What they're trying to do, and what Judge Collins, unfortunately, did is he wrote out the word for, and if you look at the Pratt opinion, it's the most comprehensive opinion that discusses, talks about the word for, and the need for intent, and Pratt does have that same whether diagnosed or not language. That really spells out the need for for. I suppose the doctor, to be honest, on January 9th, was committed to find out how Pratt did this, and should have recognized that the red mass was intact in this particular form, even though there's a chance, would your argument still be the same even though it wasn't until March 5th that the doctor recognized it for what it was? I don't think it is, because, again, the purpose of the exclusion is to prohibit people from trying to get insurance knowing that they've got a problem. That's not the case with Mr. Smith. He, unfortunately, switched his jobs. It's not quite, because it has this 90-day flowback window, which, I guess, the insurance companies write as kind of a buffer to make sure that even though the claimant may not know that he has pre-existing condition, that he may have had a pre-receiving treatment for someone from a diagnosed as you And so where I come to there is, there are other pre-existing condition exclusions that are written that say, for a diagnosis or for any significance. That is not in this policy, and it's a policy that was never delivered to either Mr. Smith, his employer, or any SPD. All these are sort of important. The question you ask is, is this not really just a procedural violation? Because it's a substantive violation, which is pulling apart from the SPD, not getting the policy agreements with it. There's a cost to Mr. Smith, which goes into court. He has to file a complaint, have a lawsuit, hire a lawyer. There's expense of it. This is not just merely some procedural thing. There's a substantive cost to Mr. Smith. Does that in some cases require something more than a substantive mitigation cost in order to conclude that there is substantive harm? It's certainly not paralytic, which I believe is the control in the following that says, use your authority or ability to bring something thereafter if you don't raise it at the administrative level. Thank you, I appreciate it. All right. I'm going to try and hit several areas. We don't have a lot of time. So Harlech doesn't involve this situation. In Harlech, there was an administrative review. There was a denial. There was an appeal. There was a decision. Then during the litigation, the attorney said, oh, we forgot about this. That's a totally different situation than when there's been no administrative review. It was an attorney doing something during litigation. That was the problem in Harlech. That's not this case. Counsel relies on Javion. Javion involved a failure to issue an appeal decision in time. It was already a denial. And, by the way, Javion was clarified, and your Honor, Judge Toland, your decision in Gatti v. Elias, where the court said, no, even in a case like this, you don't automatically get an over-review even if the regulations aren't exactly followed. Again, we don't think it was a procedural violation, but even if there was, you just can't award benefits. And we see that in McKenzie v. General Telephone, 41-13-10. It's a decision out of this court. And the court held that a retroactive award of benefits is not a remedy allowed under ERISA for procedural violation. That's the law of the circuit. Harlech has nothing to do with this situation. Um, jury, quickly, counsel asks you to ignore nine circuit cases, Arizona cases, and rely on a district of Kansas case that was prepared for the appeal for that crack case. We have the Eli v. Owen case, 545 F. 2nd, 276, and it had the exact same language, whether diagnosed or actually looked at, whether previously diagnosed or not, which almost... there's no real difference between that language and what's here. And the court said that the preexisting condition exclusion applied, even though there was no diagnosis made. The Loza case is a ninth circuit unpolished decision. It's very important. It says that... there doesn't need to be any awareness of the possibility of cancer. And also, OLYMPA converts nationwide. That's an Arizona state court decision. So we should follow particularly that decision, because you don't have any better language from OLYMPA to apply. The language that Jim's talking about is what you need. That's exactly what I'm relying on, and I see my time's up. If I can just finish that up on your own. Um, so during the long-term disability claim that you did ask for a decision, one was rendered, even though the district court again refused to consider it. There was another doctor's opinion, and I'm going to murder this name. I apologize. Dr. Shute-Kinkle... and Dr. Shute-Kinkle specifically states, the symptoms of the exam findings present in the medical evaluations dated between 12-1-2013 to 3-1-2014 were the first symptoms of the claimant's malignant tumor. I'm leaving out the official report, because I'll murder that one, too. Within a reasonable degree of medical certainty, although the examining providers were not able to make the correct diagnosis at that time. Um, so, your honors, again, we think that, uh, the district court was correct in finding in favor of compliance in the short-term, and that every other aspect of the case should be reversed, and judgment on all claims entered forward will be released. Thank you, your honors. All right, thank you both. The case is just starting to get submitted, and we are adjourned until tomorrow. Thank you for your attendance.
judges: Tallman, Watford, Guirola